## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PURSUING AMERICA'S GREATNESS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Civil Action No. 15-cv-1217 (TSC) |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Pursuing America's Greatness ("PAG") brings this action against the Federal Election Commission (the "FEC" or the "Commission") for violations of the Administrative Procedure Act (the "APA") and PAG's First Amendment rights.

PAG challenges an FEC advisory opinion interpreting and applying a provision of the Federal Election Campaign Act of 1971, as amended ("FECA"), and its implementing regulations to prohibit unauthorized, independent expenditure-only political committees like itself from including the names of federal candidates in website Universal Resource Locators ("URLs"), the titles of Facebook pages and Twitter account handles without clearly expressing opposition to those candidates, even when such websites, Facebook pages and Twitter accounts do not engage in fundraising solicitations. *See* FEC Advisory Opinion 2015-04.

Before the court is PAG's motion for preliminary injunction. Because PAG has failed to demonstrate that it is likely to succeed on the merits of its APA and First Amendment claims, and for the other reasons set forth herein, the motion is DENIED.

I.     **BACKGROUND**

PAG is an unauthorized, independent, expenditure-only political committee founded in 2015 to advocate for the election of former Governor of Arkansas Mike Huckabee as President of the United States.  (Compl. ¶¶ 25, 27).  Since July 9, 2015, PAG has operated the website located at www.ilikemikehuckabee.com and the Facebook page "I Like Mike Huckabee," which is located at www.facebook.com/ilikemikehuckabee.  (*Id.* ¶¶ 10-11).  PAG also intends to establish and operate a Twitter account utilizing a "handle" that includes the name "Huckabee."  (*Id.* ¶ 13).  PAG has not used any of its internet properties to solicit contributions or to otherwise engage in fundraising activities, and it does not intend to do so in the future.  (Mot. at 15).

The FEC is the independent agency of the United States government with exclusive jurisdiction to administer, interpret and civilly enforce FECA, 52 U.S.C. §§ 30101-30146.[1] (Opp. at 1-2).  The FEC is specifically empowered to "formulate policy" with respect to FECA (52 U.S.C. § 30106(b)(1)); "to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of" FECA (*id.* § 30107(a)(8)); to issue advisory opinions construing FECA (*id.* §§ 30107(a)(7), 30108); and to civilly enforce FECA (*id.* § 30109).  (Opp. at 2).

This case arises from PAG's allegation that the FEC's interpretation and application of FECA provision 52 U.S.C. § 30102(e)(4) and its implementing regulations at 11 C.F.R. §§ 102.14(a)-(b) violate the APA and PAG's First Amendment rights.

---

[1] Effective September 1, 2014, the provisions of FECA formerly codified in Title 2 of the United States Code were recodified in Title 52.  The specific FECA provision at issue in this litigation – 52 U.S.C. § 30102(e)(4) – was previously codified at 2 U.S.C. § 432(e)(4).  The text of this provision has not changed since it was first enacted in 1980.  This Memorandum Opinion will refer only to the present-day codification of the provision.

U.S. federal election law is complex, and the court will provide here only a brief synopsis of the statutes, regulations, case law and FEC advisory opinions that are applicable to PAG's motion for preliminary injunction.

### a. Section 30102(e)(4)

Section 30102(e)(4) of FECA, which is codified by regulation at 11 C.F.R. § 102.14(a), requires that the name of an authorized political committee "shall include the name of the candidate who authorized such committee."  It also provides that, "[i]n the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name."  PAG – as an independent, unauthorized political committee – is therefore prohibited from including Governor Huckabee's name in its committee name.[2]

### b. *Common Cause v. FEC*

In 1980, two groups, one of which was Common Cause, filed administrative complaints with the FEC alleging, *inter alia*, that several unauthorized, independent political committees had violated § 30102(e)(4)'s "ban against the use of a candidate's name in the name of an unauthorized committee" by using the name "Reagan" in the titles of fundraising projects related to the 1980 U.S. Presidential election, in which former Governor of California Ronald Reagan was a candidate.  *Common Cause v. Fed. Election Comm'n*, 842 F.2d 436, 438 (D.C. Cir. 1988). The FEC General Counsel suggested further investigation into these allegations and, pursuant to the Commission's statutory enforcement process, "[b]y a 4-2 vote the Commission found 'reason to believe' a violation had taken place and ordered further inquiry."  *Id.*

---

[2] PAG does not challenge this prohibition in its Complaint or motion.

The evidence subsequently showed that, in several campaign communications, a number of unauthorized committees had "included the name of candidate Reagan in letterheads and return addresses and, in some of the communications, asked for contributions with checks made payable to accounts bearing Reagan's name." *Id.* at 439.  At the time, however, the FEC narrowly construed § 30102(e)(4) "as applying only to the name of [a] committee itself and not to the names of any fundraising projects that [a] committee sponsors." *Id.* at 437.  Thus, because the names at issue in the administrative complaints "referred only to fundraising projects and not to the committees themselves . . . the General Counsel recommended that the Commission find no probable cause to believe that a violation had occurred." *Id.* at 439.  "On the General Counsel's recommendation, a 4-2 Commission majority voted to take no further action." *Id.*

Common Cause subsequently challenged the Commission's dismissal of its complaint in federal district court.  District Court Judge John Garrett Penn held that "[b]oth the plain understanding of the word 'name' in the context of elections" and Congress' "intent to safeguard against confusion" led to the conclusion that the FEC's narrow reading of the statutory language as applying only to a committee's official, registered name defied "common sense" and was "contrary to law." *Common Cause v. Fed. Election Comm'n*, 655 F. Supp. 619, 621-22 (D.D.C. 1986) *rev'd*, 842 F.2d 436 (D.C. Cir. 1988).  Noting that "[t]he political machinery is powered by names and what those names symbolize and identify," Judge Penn held that "whatever names [a] committee[] present[s] to the public for identification must also constitute a 'name' within the meaning of" § 30102(e)(4) because to allow otherwise "would be to allow political committees to emasculate the effectiveness of the rule." *Id.* at 621.  The district court analogized its rationale to that applied to situations where a company "may register under one name but be known to the

public or 'trade' under a different name" and determined that, in such a circumstance, "the publicly used name is as important as the company's 'official' name." *Id.* at 621 n.5.

The D.C. Circuit subsequently reversed the district court.  It found that "[t]he bare text" of § 30102(e)(4) "could conceivably accommodate either the construction adopted by the FEC" – *i.e.*, that the statute applied "only to the official or formal name under which a political committee must register" – "or that proposed by Common Cause" – *i.e.*, that the statute did not refer only to "the officially registered 'name' of a political committee but rather *any* title under which such a committee holds itself out to the public for solicitation or propagandizing purposes." *Common Cause*, 842 F.2d at 440-41.  It also reviewed the statute's "sparse legislative history," *id.* at 443, concluding that "little" in that legislative history threw doubt "on the reasonableness of the FEC's narrower interpretation" of § 30102(e)(4), *id.* at 447, and that the Commission, "on balance," had "the better of the argument."  *Id.* at 440.

Having found that "[n]either the plain language of [the statute] nor its legislative history unambiguously resolve[d] the dispute" as to whether the word "name" in § 30102(e)(4) referred to only a committee's official name or also encompassed the names of a committee's special projects, *id.* at 440, the Court moved on to determining whether the FEC's narrower interpretation was based on a permissible construction of the statute under the second step of the two-step rubric of *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Common Cause*, 842 F.2d at 448.  Noting that "[d]eference is particularly appropriate in the context of the FECA, which explicitly relies on the bipartisan Commission as its primary enforcer," and that the FEC's dismissal of a complaint should be reversed only if contrary to law, the Court determined that the FEC's interpretation was not unreasonable and was, in fact, "the

better interpretation . . . in light of [§ 30102(e)(4)'s] language and legislative history." *Id.* (citing *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981)).

Notably for purposes of the instant case, the D.C. Circuit also explicitly stated that "subsection (e)(4) is directed solely at disclosure of whether a political committee that solicits funds from the public is part of the authorized campaign machinery of a candidate," and that it acts, along with FECA's provision requiring committees to state whether or not certain communications are authorized, to "clarify[] for readers and potential contributors the candidate authorization status of the political committees who sponsor advertisements and fund solicitations." *Id.* at 442; *see also id.* at 440 (noting that "the avowed purpose" of the statute is "to eliminate confusion"). The Court also found that the statute "mainly supplements" the identification of authorization provision of FECA "by ensuring that once a contributor learns who is paying for the advertisements or who is to be the recipient of his funds, he simultaneously learns by a glance at the title whether that recipient is an authorized or unauthorized vehicle of the candidate. Thus, [the statute] avoids the kind of confusing disclaimer previously possible, 'Paid for by *Reagan for President*. Not authorized by President Reagan,' and makes [FECA's authorization] disclaimers more effective." *Id.* at 442. The D.C. Circuit also acknowledged the possibility that adopting Common Cause's reading of the statute "might prevent campaign literature employing candidates' names from misleading some members of the public who, despite proper . . . disclaimers, will not realize that the candidate's name in the solicitation 'project' does not necessarily mean he will get the money," while adopting the FEC's reading "may leave some confusion unabated." *Id.* at 448.

c.   The Special Projects Name Regulation

In 1992, prompted by concern about "the potential for confusion or abuse in . . . situation[s] where an unauthorized committee uses a candidate's name in the title of a special fundraising project," the FEC promulgated a Notice of Proposed Rulemaking ("NPRM") regarding proposed amendments to 11 C.F.R. § 102.14, the regulation implementing § 30102(e)(4).  FEC, *Special Fundraising Projects by Political Committees*, 57 Fed. Reg. 13,056, 13,057 (Apr. 15, 1992) (the "1992 NPRM").  Following the receipt of comments responding to the 1992 NPRM, and consideration of those comments and "the entire rulemaking record," the FEC decided "to adopt in its final rule a ban on the use of candidate names in the titles of all communications by unauthorized committees" (the "Special Projects Name Regulation").  FEC, *Special Fundraising Projects and Other Use of Candidate Names by Unauthorized Committees*, 57 Fed. Reg. 31,424, 31,425 (July 15, 1992) (the "1992 Explanation and Justification").  The new rule thus amended 11 CFR § 102.14(a) "to define 'name' for the purpose of the [§ 30102(e)(4)] prohibition to include 'any name under which a committee conducts activities, such as solicitations or other communications, including a special project name or other designation.'"  *Id.*

The 1992 Explanation and Justification further stated that, since *Common Cause* had been decided several years earlier,

> the Commission ha[d] become more concerned about the potential for confusion or abuse when an unauthorized committee uses a candidate's name in the title of a special fundraising project.  A person who receives such a communication may not understand that it is made on behalf of the committee rather than the candidate whose name appears in the project's title.  It is possible in these instances that potential donors think they are giving money to the candidate named in the project's title, when this is not the case.

*Id.* at 31,424.  The FEC also pointed out that, in the years leading up to the promulgation of the Special Projects Name Regulation,

the use of candidate names in the titles of projects or other unauthorized communications ha[d] increasingly become a device for unauthorized committees to raise funds or disseminate information.  Under the [Commission's] former interpretation, a candidate who objected to the use of his or her name in this manner, who shared in none of the funds received in response to the solicitation, or who disagreed with the views expressed in the communication, was largely powerless to stop it.

*Id.*

Citing examples from the 1992 NPRM, as well as examples in the rulemaking record of unauthorized committees using candidates' names to fundraise large sums of money – and doing so despite, in at least one case, a "candidate's disavowal of and efforts to stop these activities" – the Commission concluded that FECA's disclaimer requirement was not, "in and of itself, sufficient to deal with th[e] situation[s]" that the Special Projects Name Regulation was designed to protect against.  *Id.* at 31,424-25.  The Commission also determined that "the potential for confusion is equally great in all types of committee communications," not just fundraising solicitations, and noted that the *Common Cause* court had "equated solicitations with other committee communications" for purposes of § 30102(e)(4).  *Id.* at 31,425.  The FEC also noted that the Special Projects Name Regulation's "total ban" was "more directly responsive to the problem at issue, and easier to monitor and enforce," than other restrictions proposed in the 1992 NPRM, and that unauthorized committees would remain "free to choose whatever project title they desire, as long as it does not include the name of a federal candidate," and could "freely discuss any number of candidates, by name, in the body of" any special project communications. *Id.*

> d.  The Opposition Exception

In 1994, the FEC promulgated a new exception to the Special Projects Name Regulation. *See* FEC, *Special Fundraising Projects and Other Use of Candidate Names by Unauthorized Committees*, 59 Fed. Reg. 17,267 (April 12, 1994) (the "1994 Explanation and Justification").

This exception, which remains in place today, provides that "[a]n unauthorized political committee may include the name of a candidate in the title of a special project name or other communication if the title clearly and unambiguously shows opposition to the named candidate" (the "Opposition Exception" and, collectively with § 30102(e)(4) and the Special Projects Name Regulation, the "Name Identification Requirement"). *Id.* at 17,269. In promulgating the Opposition Exception, the FEC recognized "that the potential for fraud and abuse is significantly reduced in the case of" special project names clearly expressing opposition to the named candidate. *Id.*

The 1994 Explanation and Justification reiterated much of what was in the 1992 Explanation and Justification for the Special Projects Name Regulation regarding the "substantial evidence that potential contributors often confuse an unauthorized committee's registered name with the names of its fundraising projects, and wrongly believe that their contributions will be used in support of the candidate(s) named in the project titles." *Id.* at 17,267-69. The 1994 Explanation and Justification also reiterated the constitutionality of the Special Projects Name Regulation, which it described as being "narrowly designed to further the legitimate governmental interest in minimizing the possibility of fraud and abuse," and noted that the new Opposition Exception "further enhance[d] unauthorized committees' constitutional rights by exempting from the [Special Projects Name Regulation] those titles that clearly indicate opposition to the named candidate." *Id.* at 17,268.

     e.  <u>The CAP Advisory Opinion</u>

In June 2015, Collective Actions PAC ("CAP"), an unauthorized, independent expenditure-only political committee that advocates for the election of U.S. Senator from Vermont Bernie Sanders as President of the United States, filed an advisory opinion request with the FEC asking whether it was permitted to include Senator Sanders' name in the names of its

internet properties – namely, (i) the websites RunBernieRun.com, ProBernie.com and BelieveInBernie.com; (ii) the Facebook page "Run Bernie Run"; and (iii) the Twitter accounts @Bernie_Run and @ProBernie.  (Mot. at 11-14).  CAP did not use these internet properties to solicit donations for itself, but it did use them to disseminate information about Senator Sanders and to provide links to Senator Sanders' official campaign website, including his official donation page.  (Opp. at 14).

On July 16, 2015, the FEC determined via advisory opinion that CAP was not permitted to use Senator Sanders' name in the names of its internet properties because doing so would run afoul of the Name Identification Requirement.  *See* FEC Advisory Opinion 2015-04 (the "CAP Advisory Opinion").  Specifically, the Commission found that, "[b]ecause the names of [CAP's] websites and social media accounts that include Senator Sanders's name do not clearly express opposition to him, those sites and accounts are impermissible under 11 C.F.R. § 102.14."  *Id.* at 4.  The Commission noted, however, "that this restriction only applie[d] to the titles of [CAP's] projects," and that CAP was "free to promote Senator Sanders (or any other candidate) by name in the body of any website or other communication.  *Id.* (citing 1994 Explanation and Justification at 17,268).  The Commission's vote adopting the CAP Advisory Opinion was a unanimous 6-0.  (Opp. at 13).

The CAP Advisory Opinion also stated that, "[w]hen the Commission revised the definition of 'name' in section 102.14 to include 'any name under which a committee conducts activities,' the Commission rejected a proposal to limit the restriction to fundraising projects; instead, the Commission noted that 'the potential for confusion is equally great in all types of committee communications'" and "therefore determined that a 'total ban' on the use of candidate names in committee names was more 'responsive to the problem,' as well as easier to monitor

10

and enforce." CAP Advisory Opinion at 3 (quoting 1992 Explanation and Justification at 31,425). The CAP Advisory Opinion also noted that the Commission had "amended the regulation to apply to 'solicitations *or other communications*,' . . . which necessarily means that communications need not be solicitations in order to fall within" the Special Projects Name Regulation. *Id.* (quoting 11 C.F.R. § 102.14(a)).

   f. <u>PAG's Cessation of Activity on Its Website and Facebook Page</u>

  On July 17, 2015, the day after the CAP Advisory Opinion was issued, PAG ceased updating its website and Facebook page. (Compl. ¶ 18).

  Ten days later, on July 27, 2015, PAG filed its Complaint and motion for preliminary injunction, alleging that its internet properties are materially indistinguishable from the internet properties at issue in the CAP Advisory Opinion, and that the FEC must be enjoined from applying the Name Identification Requirement to its internet properties because it violates the APA, as well as the First Amendment. (*Id.* ¶¶ 17, 32-36, 41; Mot. at 1, 14-16). The FEC does not dispute PAG's standing to bring a pre-enforcement challenge as applied to its own circumstances, and has formally endorsed the challenged interpretation of the Name Identification Requirement. (Opp. at 22 n.4).

## II. LEGAL STANDARD

  In order to prevail on a motion for preliminary injunction, a movant must demonstrate the following: (i) a substantial likelihood of success on the merits; (ii) that the movant would suffer irreparable injury if the injunction is not granted; (iii) that the balance of equities tips in the movant's favor; and (iv) that the public interest would be furthered by the issuance of the injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right," *Munaf v.*

*Geren*, 553 U.S. 674, 689-90 (2008) (internal quotation and citations omitted), and "that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citation omitted).

In the past, courts in this Circuit used a "sliding scale" approach in analyzing the four preliminary injunction factors, meaning that a particularly strong showing on one factor could make up for a weaker showing on another. *See*, *e.g.*, *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999). Under this approach, "even if [a] plaintiff only raises a serious legal question on the merits, rather than a likelihood of success on the merits, a strong showing on all three of the other factors [could] warrant entry of injunctive relief." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 196-98 (D.D.C. 2014) (internal quotation, citation and bracket omitted).

It is not clear whether this approach survives after the Supreme Court's 2008 decision in *Winter*, which suggested that a likelihood of success on the merits must always be shown. *See*, *e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (reading *Winter* "at least to suggest if not to hold" that plaintiffs face a more demanding burden under which "a likelihood of success is an independent, free-standing requirement for a preliminary injunction") (internal quotation and citation omitted); *Perry v. Perez*, 132 S.Ct. 934, 942 (2012) ("Plaintiffs seeking a preliminary injunction of a statute must normally demonstrate that they are likely to succeed on the merits of their challenge to that law.") (citing *Winter*, 555 U.S. at 20). While this Circuit "has repeatedly declined to take sides . . . on the question of whether likelihood of success on the merits is a freestanding threshold requirement to [the] issuance of a preliminary injunction," *Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc), it is nevertheless clear that a plaintiff's

likelihood of success on the merits is a "key issue [and] often the dispositive one" at the preliminary injunction stage. *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011).  At a minimum, "[e]ven if the sliding scale approach to assessing eligibility for preliminary injunctions survived *Winter*," where a movant makes "a weak showing on the first factor," the movant must "show that all three of the other factors so much favor the [movant] that they need only have raised a serious legal question on the merits." *Am. Meat Inst.*, 746 F.3d at 1074 (internal quotation and citations omitted).

## III.    ANALYSIS

### a.   Likelihood of Success on the Merits

For the reasons set forth below, the court finds that PAG has not established a likelihood of success on the merits of either its APA claim or its First Amendment claims.

#### i.   Likelihood of Success on the Merits of PAG's APA Claim

PAG's first merits argument is that the Name Identification Requirement "is arbitrary, capricious, an abuse of discretion, and contrary to law under the Administrative Procedure Act." (Mot. at 21; *see also id.* at 20-22).

This court's limited function in reviewing a final agency action under the APA is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Kaiser Found. Hosps. v. Sebelius*, 828 F.Supp.2d 193, 198 (D.D.C. 2011) (internal quotation and citation omitted).  This standard of review is "narrow," and a court applying it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard requires the agency to examine the relevant evidence and "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation and citation omitted). But this explanation "need not be a model of analytic precision to survive a challenge." *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) (internal quotation and citation omitted). Thus, a court "must uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Am. Radio Relay League, Inc. v. Fed. Commc'n Comm'n*, 524 F.3d 227, 248 (D.C. Cir. 2008) (internal quotation and citation omitted).

Additionally, when an agency interprets its own rules and regulations, as the FEC did here in the CAP Advisory Opinion, a court must, "as a general rule, defer[] to it unless that interpretation is plainly erroneous or inconsistent with the regulation." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (internal quotation and citation omitted); *see also K N Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1295, 1300 (D.C. Cir. 1992) (an agency is entitled to "even more deference in its interpretation of its own regulations than in the reading of its statutory mandate"). Thus, if the Special Projects Name Regulation and Opposition Exception do not themselves violate the APA, this court must defer to the FEC's interpretation and application of them in the CAP Advisory Opinion "unless an 'alternative reading is compelled by [their] plain language or by other indications of the [FEC's] intent at the time of [their] promulgation.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

In support of its APA claim, PAG argues that, by applying the Name Identification Requirement to internet properties that do not engage in fundraising solicitations, the CAP Advisory Opinion applied the Name Identification Requirement "to a context not contemplated in the FEC's 1992 and 1994 rulemakings, and in a manner that goes far beyond the FEC's asserted justification for those rulemakings." (Mot. at 20).  It is clear from the rulemaking record, however, that while the 1992 and 1994 rulemakings that resulted in the promulgation of the Special Projects Name Regulation and Opposition Exception were *primarily* focused on fundraising-related fraud, abuse and confusion, they were by no means *exclusively* concerned with fundraising-related dangers.  PAG acknowledges this fact in its reply brief, where it states that the 1992 and 1994 rulemakings were focused "almost exclusively" on fundraising.  (Reply at 8; *see also id.* at 8-9 (acknowledging that "the 1992 and 1994 rulemakings also assert that avoiding 'confusion' was one of the government's interests that justified expanding the scope" of § 30102(e)(4))).

For example, the 1992 Explanation and Justification explicitly stated that "the use of candidate names in the titles of projects or other unauthorized communications has increasingly become a device for unauthorized committees to . . . disseminate information," and noted that the Commission's former interpretation would have left "a candidate who objected to the use of his or her name in this manner, . . . or who disagreed with the views expressed in the communication, . . . largely powerless to stop it."  1992 Explanation and Justification at 31,424. The Commission also determined that "the potential for confusion is equally great in *all types* of committee communications," not just fundraising solicitations.  *Id.* at 31,425 (emphasis added). Thus, when the FEC added the Special Projects Name Regulation to the regulatory framework in 1992, it "specifically considered and rejected the distinction that [PAG now] proposes."  CAP

15

Advisory Opinion at 3.  And while PAG reads "[t]he title of the FEC's 1992 and 1994 rulemakings ('Special Fundraising Projects and Other Use of Candidate Names by Unauthorized Committees')" as support for the proposition that the rulemakings were focused on fundraising (Mot. at 21), this reading ignores the fact that the words "Other Use of Candidate Names" clearly reveal a "focus" on the use of candidate names in the titles of things other than special fundraising projects.

This court therefore finds that the relevant evidence from the 1992 and 1994 rulemakings establishes the requisite "rational connection between the facts found and the choice made" in promulgating the Special Projects Name Regulation and the Opposition Exception, as well as in issuing the CAP Advisory Opinion.  *State Farm*, 463 U.S. at 43.  And even if "the FEC's asserted justification for [the 1992 and 1994] rulemakings" was, in fact, limited exclusively to the fundraising context (Mot. at 20), the court notes that it is at least conceivable that special project communications that do not include explicit solicitations could nevertheless impact fundraising.  For example, permitting unauthorized committees to include a candidate's name in the name of their special projects may allow those committees to "exploit ambiguity" about their candidate authorization status and "take advantage of confusion created by their project names," with the result that "a contributor [may] *think*[] that a $50,000 contribution to a project such as 'I Like Mike Huckabee' *is* a contribution to Mr. Huckabee, even though it is not, . . . even in the absence of any solicitation."  (Opp. at 28-29).[3]

_____

[3] At the hearing on PAG's motion, the court noted that even if PAG is "not explicitly making fundraising solicitations through [its] Internet properties, people do still donate to" PAG, and asked counsel the following question:

> [I]f someone donates to Pursuing America's Greatness *thinking* that they're actually donating to Governor Huckabee because they had been led to Pursuing America's Greatness' donation page after visiting [the website or the Facebook

The court also finds that the FEC's interpretation of the Name Identification Requirement in the CAP Advisory Opinion is not contrary to law, nor is it contrary to the FEC's intent at the time of the adoption of the Special Projects Name Regulation and the Opposition Exception. *See Thomas Jefferson Univ.*, 512 U.S. at 512. The court credits the fact that "the Commission specifically considered whether it could accomplish its goals through alternative means, and concluded . . . that its approach was necessary." (Opp. at 21). The court also agrees with the FEC about "how limited the effect of the [Name Identification Requirement is] in practice," given that an unauthorized committee can still use a candidate's name in a special project's subheading and urge that candidate's "election, by name, in large, highlighted type, throughout the communication." (*Id.* at 22) (quoting 1994 Explanation and Justification at 17,268-69).

---

       page], isn't the confusion being caused by those Internet properties having an
       effect on fundraising even without direct solicitation?

Transcript of August 20, 2015 Preliminary Injunction Hearing (the "Hearing Transcript") at
11:17-12:4.

Counsel for PAG responded that there was "nothing" on the website or Facebook page "that
would lead a voter directly to where they could make a donation" to PAG, but acknowledged
that a voter could still go to the website or Facebook page, "read the disclaimer" identifying
PAG, and then "separately locate the URL for" PAG's official website, where that voter could
make a donation to PAG. *Id.* at 12:5-21. Counsel stated that such a voter would be "very aware"
that the donation page on PAG's official website "is not Governor Huckabee's presidential
campaign donation page," presumably because the voter had read the disclaimers on the website
or the Facebook page, as well as those on PAG's donation page. *Id.*

This argument presupposes, however, that these disclaimers, taken alone, would be sufficient to
dispel the kind of confusion that the court's question concerned. This presupposition is belied by
Exhibit A to the FEC's opposition brief, which is discussed in detail below. It is also belied by
the D.C. Circuit's decision in *Common Cause*, where it acknowledged the possibility that
"campaign literature employing candidates' names" could "mislead[] some members of the
public who, despite proper . . . disclaimers, will not realize that the candidate's name in the
solicitation 'project' does not necessarily mean he will get the money." 842 F.2d at 448.

The court also agrees with the Commission that its "anti-confusion rationale" is easily discernible, and that permitting unauthorized committees to include a candidate's name in the name of their special projects could permit such committees to "hold themselves out as agents of particular candidates," thereby increasing "opportunities for confusion, fraud, and abuse." (*Id.* at 23).  The court also agrees with the FEC that the messages that unauthorized committees and their special projects disseminate "directly implicate the government's anti-confusion interest even if they merely present 'information' and do not request money." (*Id.* at 23-24).  This is because "voters may fail to distinguish between projects of the actually authorized 'Huckabee for President, Inc.' committee and an unauthorized committee's project that might be named, say, 'Huckabee for America' or 'Citizens for Huckabee.'" (*Id.* at 23).

Exhibit A to the FEC's opposition brief – which identifies hundreds of comments on the Facebook page that appear to be directed to Governor Huckabee himself – illustrates this potential for confusion.  PAG responds to these comments by noting that many of them were posted prior to PAG taking over the Facebook page on July 9, 2015, and by stating that the FEC failed "to put the number or content of these comments in any context." (Reply at 11-12).  This response is unavailing.

As an initial matter, while many of these comments were, indeed, posted prior to PAG taking over the Facebook page on July 9, 2015, a significant number of them were posted after that date. (*See* Opp. Ex. A).  Additionally, when the court invited counsel for PAG to put these Facebook comments in "the proper context" and "explain why it's not a problem that these people are confused in thinking that [the Facebook page] is associated [with] and run by Governor Huckabee," counsel responded that "if voters looked at the [Facebook page] and didn't read the disclaimer, that's not the fault of Pursuing America's Greatness.  That is a consequence

of a voter not reading the complete content before they post something." Hearing Transcript at

7:24-8:17. While it is certainly true that the confusion on display throughout the Facebook page

stems in part from commenters not reading the Facebook page's disclaimers before posting their

comments, this fact does not help PAG's argument. Rather, it reinforces the FEC's finding in

the 1992 Explanation and Justification for the Special Projects Name Regulation that FECA's

disclaimer requirement is not, on its own, sufficient to address the kind of confusion that the

Special Projects Name Regulation was designed to protect against. *See* 1992 Explanation and

Justification at 31,424-25. In other words, the comments on the Facebook page directed towards

Governor Huckabee clearly demonstrate that "proper disclaimers" do not always suffice to dispel

the confusion wrought by a confusing or misleading special project name, and that rules and

regulations restricting the use of confusing or misleading names are needed to limit voter

confusion. Hearing Transcript at 8:9-11.

In sum, PAG has offered nothing that would suggest that the FEC is incorrect in asserting

that "confusion, fraud, and abuse plainly can occur outside of the context of fundraising." (Opp.

at 29). PAG has also failed to explain why the *Common Cause* court's acknowledgement of the

possibility that the FEC's present reading of the statute "might prevent campaign literature

employing candidates' names from misleading some members of the public," while adopting the

equivalent of PAG's reading of it "may leave some confusion unabated," does not apply equally

to fundraising projects and non-fundraising projects alike. *Common Cause*, 842 F.2d at 448.

Indeed, the court agrees with the FEC that

> [j]ust as an unauthorized project that trades on a candidate's name in its title can
> divert dollars away from a candidate's message, it can also divert (or distort)
> information, confusing readers into believing, say, that PAG's message is
> Mr. Huckabee's. Mr. Huckabee may disagree with everything that appears on the
> Huckabee Facebook page PAG operates, and PAG is free to say whatever it wants
> about Mr. Huckabee. But permitting PAG to imply that its speech is

> Mr. Huckabee's by using the candidate's name in the title to present *PAG's* messages would disserve the public.

(Opp. at 29) (citation omitted).

Because this court finds that there is "a rational connection between the facts found" by the FEC during the 1992 and 1994 rulemakings and "the choice[s] made" by the FEC in promulgating the Special Projects Name Regulation and Opposition Exception and issuing the CAP Advisory Opinion, *State Farm*, 463 U.S. at 43, and because there is no indication that the Commission's interpretation of the Name Identification Requirement in the CAP Advisory Opinion is contrary to law or to the agency's intent at the time of its adoption, PAG has not established that it is likely to succeed on the merits of its APA claim. *See Thomas Jefferson Univ.*, 512 U.S. at 512.[4]

---

[4] There is also an issue in this case regarding whether a website's URL constitutes the "name" or "title" of that website, such that the Name Identification Requirement even applies. PAG cites a 2011 FEC matter under review in which a footnote to a "Statement of Reasons" authored by three FEC Commissioners reflects those Commissioners' view that, while a website constitutes a special project of an unauthorized committee, the URL of that website is not the special project's name or title. (Mot. at 10-11). However, because the CAP Advisory Opinion, which was approved unanimously (including by two of the Commissioners who had authored the 2011 Statement of Reasons), found that a website's URL *is* that website's name or title (*see* CAP Advisory Opinion at 3 (referring to the "names of [CAP's] websites" as those websites' URL addresses)), this court need not wade into the question of whether the agency is somehow bound by *dictum* in a Statement of Reasons authored by only three of its Commissioners. Rather, the question before the court on this point is a narrow one: Was it "plainly erroneous or inconsistent" with the Name Identification Requirement for the FEC to find in the CAP Advisory Opinion that a website's URL constitutes that website's name or title? *Decker*, 133 S. Ct. at 1337. The court holds that it was not, and finds no basis for upsetting the common sense conclusion reached in the CAP Advisory Opinion that a website's name or title is its URL.

The parties also dispute whether and how the D.C. Circuit's decision in *Common Cause* impacts PAG's APA claim. Because the court finds, for the reasons set forth above, that there is a "rational connection between the facts found" by the FEC regarding the risk of voter confusion and "the choice[s] made" by the FEC in enacting the Special Projects Name Regulation and Opposition Exception and issuing the CAP Advisory Opinion, it need not determine whether, under the circumstances present in this case, the step one *Chevron* analysis applied to the FEC's

*ii.  Likelihood of Success on the Merits of PAG's First Amendment Claims*

PAG argues that the FEC's interpretation of the Name Identification Requirement acts as a prior restraint because it "explicitly forbids speech prior to that speech occurring, and if someone does speak that person is subject to prison for knowing and willful violations [of] FECA."  (Reply at 14-15).  PAG also argues that the Name Identification Requirement impermissibly regulates "speech on the basis of 'the idea or message expressed'" because it creates two categories of speech: (i) oppositional speech, which is permitted, and (ii) non-oppositional speech, which is prohibited.  (Mot. at 30-31) (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)).  Therefore, PAG argues that the FEC's interpretation should be subject to strict scrutiny because it prohibits political speech as both a prior restraint and an impermissible content-based speech regulation.  (Mot. at 18) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)).  Under this view, the FEC would be required to prove that the Name Identification Requirement furthers a compelling government interest and is narrowly tailored to achieve that interest.

The FEC contends that PAG's First Amendment-based arguments in favor of strict scrutiny are incorrect because the Name Identification Requirement "is an integral part of FECA's disclosure regime" and is therefore "reviewed for 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."  (Opp. at 24-25) (quoting *Citizens United*, 558 U.S. at 366-67).  In support, the FEC cites *Common Cause*, 842 F.2d at 442, which refers to § 30102(e)(4) as one of the ways in which FECA "require[s] political bodies to disclose the identity of persons

---

present interpretation of § 30102(e)(4) in *Common Cause* independently requires it to find that PAG is unlikely to succeed on the merits of its APA claim.  *State Farm*, 463 U.S. at 43.

associated with them," and *Galliano v. U.S. Postal Serv.*, 836 F.2d 1362, 1367-68 (D.C. Cir. 1988), which characterizes § 30102(e)(4) as part of FECA's "specific disclosure requirements" and "extensive disclosure requirements." (*Id.* at 24). The FEC also argues that the Name Identification Requirement's disclosure function is "apparent from the purpose of the provision," which is to disclose whether a given political committee is an authorized committee or an unauthorized committee. (*Id.* at 24-25; *see also Common Cause*, 842 F.2d at 442 (noting that § 30102(e)(4) "avoids the kind of confusing disclaimer previously possible, 'Paid for by *Reagan for President*. Not authorized by President Reagan,' and makes § [30120(a)'s] disclaimers more effective")).

In response to PAG's First Amendment arguments, the FEC contends that the Name Identification Requirement is not a prior restraint, but rather, provides for a subsequent punishment. (Opp. at 29-31). Additionally, it asserts that PAG does not have standing to bring a content-based challenge to the Name Identification Requirement, because even if this court held that the Opposition Exception was unconstitutional under *Reed*, PAG would nevertheless still be in violation of the Special Projects Name Regulation. (*Id.* at 32-33). The FEC also argues that even if PAG could demonstrate standing to challenge the Opposition Exception, its content-based challenge would still fail because neither the Opposition Exception nor the Name Identification Requirement are content-based restrictions. (*Id.* at 33-37). Finally, the FEC argues that even if the court were to find that the Name Identification Requirement was not a part of FECA's disclosure regime subject to intermediate or exacting scrutiny, and that it was either a prior restraint or an impermissible content-based restriction, the Name Identification Requirement would nevertheless still satisfy strict scrutiny, citing *Burson v. Freeman*, 504 U.S.

191, 199 (1992), which held that the government has a compelling interest in protecting voters from confusion and undue influence. (*Id.* at 38-40).

The court finds that § 30102(e)(4) and the other components of the Name Identification Requirement are part and parcel of FECA's disclosure regime because they are "directed solely at disclosure of whether a political committee that solicits funds from the public is part of the authorized campaign machinery of a candidate," *Common Cause*, 842 F.2d at 442, and "only appl[y] to the titles" of an unauthorized committee's projects, leaving any such committee "free to promote [any candidate] by name in the body of any website or other communication," such as those posted on Facebook pages or Twitter accounts.  CAP Advisory Opinion at 4.[5]  Thus, while the Special Projects Name Regulation, like other "[d]isclaimer and disclosure requirements[,] may burden the ability to speak" by prohibiting certain limited categories of speech (*i.e.*, the names of federal candidates) in certain limited areas (*i.e.*, the names or titles of unauthorized committees' special projects), it "impose[s] no ceiling on campaign-related activities . . . and do[es] not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (internal quotations and citations omitted).  Such limited burdens on speech "often represent[] a less restrictive alternative to flat bans on certain types or quantities of speech," and are subject to intermediate or exacting scrutiny. *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1460

---

[5] *See also* 1992 Explanation and Justification at 31,425 ("Committees are not barred from establishing specially designated projects: they are free to choose whatever project title they desire, as long as it does not include the name of a federal candidate.  Also, committees may freely discuss any number of candidates, by name, in the body of a communication."); 1994 Explanation and Justification at 17,268-69 ("Unauthorized committees remain free to discuss candidates throughout [any special project] communication[s]; and to use candidates' names as frequently, and highlight them as prominently (in terms of size, typeface, location, and so forth) as they choose.  In other words, while a committee could not establish a fundraising project called 'Citizens for Doe,' if Doe is a federal candidate, it could use a subheading such as 'Help Us Elect Doe to Federal Office,' and urge Doe's election, by name, in large, highlighted type, throughout the communication.").

(2014) (plurality opinion) (citation omitted); *see also Citizens United*, 558 U.S. at 369 ("The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech.") (citation omitted).

The Name Identification Requirement simply (i) requires a political committee to disclose whether that committee is authorized or unauthorized, and (ii) dictates that such disclosure be made in the name of the committee itself, or in any name under which the committee conducts activities, including a special project name.  The Name Identification Requirement is therefore best construed as a disclosure provision that requires disclosure of the candidate authorization status of a political committee and its special projects to be made in a particular place, just as do other disclosure and disclaimer regulations concerning publicly disseminated political committee communications.[6]  The Opposition Exception, in particular, exists because the clear expression of opposition to a named candidate in the title of an unauthorized committee's special project suffices to disclose the fact that the special project is not authorized by the named candidate, hence the FEC's determination "that the potential for fraud and abuse is significantly reduced in the case of" special project names clearly expressing opposition to the named candidate.  1994 Explanation and Justification at 17,269.

---

[6] *See*, *e.g.*, 52 U.S.C. §§ 30120(a)(1)-(3), 30120(c)(1)-(3) (requiring political committees that make disbursements "for the purpose of financing any communication through any . . . type of general public political advertising" to "clearly state" on any such communication whether that communication has been paid for and/or authorized by a candidate or that candidate's authorized committee, and requiring such statement to be "of sufficient type size to be clearly readable," "contained in a printed box set apart from the other contents of the communication" and "printed with a reasonable degree of color contrast between the background and the printed statement"); *see also Citizens United*, 558 U.S. at 366 (holding that disclaimer and disclosure provisions of the Bipartisan Campaign Reform Act of 2002 did not violate the First Amendment by requiring that, *inter alia*, "televised electioneering communications funded by anyone other than a candidate must include a disclaimer that '_____ is responsible for the content of this advertising' . . . made in a 'clearly spoken manner,' and displayed on the screen in a 'clearly readable manner' for at least four seconds") (citations omitted).

At the hearing on PAG's motion, the court asked counsel for PAG about the *Common Cause* and *Galliano* courts' clear references to § 30102(e)(4) being a part of FECA's disclosure regime, and counsel responded as follows:

> [W]e're not here challenging 30102(e)(4) as it's written.  We're bringing an as-applied challenge to the limitation on names in URLs and social media identifiers where there's no fundraising.  In that context, in terms of disclosure requirements, there is no disclosure that we could make that would make this permissible.
>
> In all of the disclosure cases where courts review things with respect to intermediate scrutiny, there is some disclosure or disclaimer that can be on the communication, incorporated into the communication, or documentation or paperwork filed with the body that is governing the disclosure that allows the speech to happen.  In this case, what they're doing is actually saying – they use the phrase "total ban," and they're saying you can't use it.

Hearing Transcript at 21:19-22:12.  But this argument ignores the fact that the Special Projects Name Regulation *does* require a disclosure to "be on" or "incorporated into the communication" by requiring disclosure in the name or title of the special project that is disseminating that communication, and that doing so is precisely what "allows the speech to happen" in the body of that special project communication, rendering such communications "permissible."  *Id.*  PAG's reliance on the fact that the FEC has referred to the Special Projects Name Regulation as a "ban" or "total ban" is unavailing.  Despite the FEC's use of the word "ban," the Special Projects Name Regulation does not "ban" any speech outright.  Rather, it burdens speech slightly by restricting a limited class of speech (candidate names) only as to a particular location (the names of unauthorized committees and their special projects), and relegating that speech to another location (the body of special project communications made by unauthorized committees).

The Supreme Court's opinion in *Burson* is instructive here.  The Court held in that case that a Tennessee statute prohibiting the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place was narrowly tailored to

serve the compelling state interest in preventing voter intimidation and election fraud, as required by the First Amendment. *See Burson*, 504 U.S. at 199 ("Tennessee argues that its restriction protects the right to vote in an election conduced with integrity and reliability. The interests advanced by Tennessee obviously are compelling ones. This Court has recognized that the right to vote freely for the candidate of one's choice is of the essence of a democratic society. Indeed, no right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Accordingly, this Court has concluded that a State has a compelling interest in protecting voters from confusion and undue influence . . . [and] indisputably has a compelling interest in preserving the integrity of its election process.") (internal quotations, citations and brackets omitted). When counsel for PAG was asked at the hearing whether *Burson* (which was raised in the FEC's opposition brief but was not addressed in PAG's reply brief), was "fatal to [PAG's] First Amendment claim insofar as it indicates that measures designed to avoid election-related confusion satisf[y] strict scrutiny as long as they're narrowly tailored," counsel responded that

> the questions about electioneering outside of polling places have been essentially viewed under time, place, and manner restrictions, because what they're trying to avoid is essentially somebody plastering the door of the entrance to a polling place with a candidate's signs.
>
> So at 101 feet, you can engage in the same speech; you just can't engage in it at 99 feet out. So it doesn't prohibit the speech at all, the restriction [in *Burson*]. It just prohibits where you can make the speech. So you can't hand out the flyer 98 feet from the polling place, but you can hand it out 102 feet from the polling place. There's nothing in what the FEC does here that allows us to engage in our same speech no matter what we do.

Hearing Transcript at 24:18-25:5.

The parallel between *Burson* and the instant case is readily evident, however. Here, just as in *Burson*, PAG can say whatever it wants about Governor Huckabee in the body of its special

project communications, including referring to him by name and using the "I Like Mike Huckabee" slogan.  It just cannot do so in the names or titles of those communications.  Thus, to use counsel for PAG's own words, the Name Identification Requirement "doesn't prohibit the speech at all[,] . . . [i]t just prohibits where you can make the speech." *Id.*

The same parallel can be seen in *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 919 F.2d 148 (D.C. Cir. 1990) (per curiam) (which, like *Burson*, was raised in the FEC's opposition brief but was not addressed in PAG's reply brief). In *Christian Knights*, the Ku Klux Klan applied for a permit "to march from the Washington Monument to Capitol Hill," but the District of Columbia only "agreed to issue a permit . . . allowing them to march over a shorter route."  919 F.2d at 148.  The Klan "sought an injunction compelling the District of Columbia to issue a permit allowing them to march the full distance from the Monument to the Capitol."  *Id.* at 148-49.  The D.C. Circuit held that the case did not "involve an effort by the District of Columbia to prohibit [the Klan's] freedom of expression" given that the Klan had "been given a permit to march and to demonstrate," and would therefore have "the opportunity to convey their message along the approved route and at a permitted demonstration on the Capitol grounds."  *Id.* at 149.  The D.C. Circuit also found that *Elrod v. Burns*, 427 U.S. 347 (1976) (cited by PAG in its motion), did not apply, because that was a "case in which [the] petitioners' First Amendment rights were totally denied by the disputed Government action," while the Klan was still permitted to march, albeit along a shorter route. *Id.*; *see also id.* at 150 (noting that certain "heckler's veto" cases cited by the Klan were not dispositive of its claims because those cases all "involved situations in which petitioners ha[d] been *totally denied* an otherwise available forum for expression").

The absence here of a total denial of any speech rights is precisely how the FEC distinguished *Buckley v. Valeo*, 424 U.S. 1 (1976) and *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480 (1985) during the rulemaking process back in the early 1990s, noting that both of those cases "involved total bans on independent expenditures, or certain types of independent expenditures," whereas the Special Projects Name Regulation did not.  1992 Explanation and Justification at 31,425.  Additionally, in *Buckley,* the Supreme Court "explained that disclosure could be justified based on a governmental interest in providing the electorate with information about the sources of election-related spending," and the Court again applied this same interest in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003), where there was "evidence in the record that independent groups were running election-related advertisements while hiding behind dubious and misleading names."  *Citizens United*, 558 U.S. at 367 (internal quotations, citations and brackets omitted).  The rulemaking record in this case contains the same kind of evidence as in *McConnell*, and the disclosures required by the Name Identification Requirement are therefore justified because they "provid[e] the electorate with information," *McConnell*, 540 U.S. at 196, and "insure that the voters are fully informed" about the person or group who is speaking in special project communications of unauthorized committees.  *Buckley*, 424 U.S. at 76; *see also First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected.") (citations omitted); *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc), *cert. denied*, 562 U.S. 1003 (2010) (holding that political committee disclosure requirements further the public's "interest in knowing who is speaking about a candidate and who is funding that speech," and "deter[] and help[] expose violations of other

28

campaign finance restrictions"). "At the very least," the Name Identification Requirement helps to "avoid confusion by making clear" to the voting public that communications disseminated via unauthorized committees' special projects "are not funded by a candidate or political party." *Citizens United*, 558 U.S. at 368.

The Name Identification Requirement is therefore "substantially related to the government's interests in limiting confusion, fraud, and abuse" because it "serve[s] to clarify the candidate-authorization status of political committees." (Opp. at 27). The court agrees with the FEC that "the positive requirement of including candidate names in [the names of] authorized committees cannot function without the corresponding restriction for unauthorized committees," and that permitting "unauthorized political committees to establish special projects that use candidate names under the shell of the actual committee would vitiate" § 30102(e)(4). (*Id.* at 27-28). This court finds no reason to doubt or question the conclusion reached by the FEC, after "two rounds of full-bore notice-and-comment rulemaking" (*id.* at 21), that permitting unauthorized committees to use candidate names in their special project titles in a way that does not clearly express opposition to the named candidates would create opportunities for those projects "to exploit ambiguity about their identity" and "take advantage of confusion created by their project names – even in the absence of any solicitation." (*Id.* at 28-29). The court also agrees with the FEC that, "[j]ust as an unauthorized project that trades on a candidate's name in its title can divert dollars away from a candidate's message, it can also divert (or distort) information, confusing readers into believing, say, that PAG's message is Mr. Huckabee's," and that "permitting PAG to imply that its speech is Mr. Huckabee's by using the candidate's name in the title to present *PAG's* messages would disserve the public." (*Id.* at 29). "[P]reventing the use of candidate names in the names of unauthorized political committee projects is thus

'responsive to the problem' of confusion, and therefore is substantially related to the government's important disclosure interests." (*Id.*) (quoting CAP Advisory Opinion at 3).

The need for FECA disclosure provisions like the Name Identification Requirement is particularly apparent in the context of dissemination of communications via internet-based special projects like websites, Facebook pages and Twitter accounts.  The hundreds of comments posted on PAG's Facebook page that appear to be directed to Governor Huckabee highlight the need for such disclosures, and belie PAG's arguments that clarifying the authorization status of an unauthorized committee's special projects could constitute a legitimate government interest only in the fundraising context.  (*See* Opp. Ex. A).  And, as the Supreme Court explained in its plurality opinion in *McCutcheon*, "[w]ith modern technology, disclosure now offers a particularly effective means of arming the voting public with information. . . . Today, given the Internet, disclosure offers much more robust protections against corruption" and "is effective to a degree not possible at the time *Buckley*, or even *McConnell*, was decided." 134 S. Ct. at 1460.

In sum, "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Citizens United*, 558 U.S. at 369.  This interest is a legitimate government interest as well, and goes hand-in-hand with the legitimate government interest in limiting the possibility of fraud, confusion and abuse in federal elections.  Because the Name Identification Requirement is substantially related to these legitimate government interests, and only minimally burdens political committee speech, it satisfies the intermediate level of constitutional scrutiny to which FECA's disclosure and disclaimer rules are to be subjected.

> b.   The Other Preliminary Injunction Factors

The court need not address the other preliminary injunction factors in light of PAG's failure to demonstrate likelihood of success on the merits of its claims. *See Comm. of 100 on the*

*Fed. City v. Foxx*, 2015 WL 3377835, at *5 (D.D.C. May 26, 2015); *Winstead v. EMC Mortgage Corp.*, 621 F. Supp. 2d 1, 4-5 (D.D.C. 2009); *see also* Mot. at 31-32 (citing *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor.")).

Nevertheless, the court finds it worthwhile to briefly address the three remaining factors, as they reinforce its finding that the entry of a preliminary injunction is not warranted here.

### i.  The Threat of Irreparable Harm

PAG's irreparable harm argument relies exclusively on its First Amendment claims, and essentially presupposes a finding that it is likely to succeed on the merits of those claims.  (Mot. at 31-33; *see also* Opp. at 40 ("PAG simply repeats its merits arguments and assumes that irreparable harm flows from its contentions that its First Amendment rights have been infringed.")).  Specifically, PAG argues that it faces irreparable harm "each and every day that it is threatened by the FEC's unconstitutional speech ban."  (Mot. at 33).  Because this court has found that PAG is not likely to succeed on the merits of its First Amendment claims, however, it follows that PAG has not "demonstrate[d] that [its] 'First Amendment interests [are] either threatened or in fact being impaired.'"  (*Id.* at 32) (quoting *Wagner v. Taylor*, 836 F.2d 566, 576 (D.C. Cir. 1987)).

Additionally, because PAG has not demonstrated that that it will be prevented from speaking, as opposed to merely having one aspect of its speech – the referencing of candidate

names – relegated from the titles of its special project communications to the bodies of those communications, it has not demonstrated that it will be irreparably harmed absent the issuance of a preliminary injunction.  *See Christian Knights*, 919 F.2d at 149-50 (finding that the issuance of a parade permit for a shorter route than requested "does not constitute irreparable harm for the appellees" because appellees would still "have the opportunity to convey their message along the approved route," and distinguishing *Elrod* on the ground that, in that case, "petitioners' First Amendment rights were totally denied by the disputed Government action").

Based on these findings, PAG has failed to establish the irreparable harm prong of the preliminary injunction analysis.

### ii.   The Balance of Equities

PAG argues that the balance of equities favors its claim, since, while it "seeks to exercise its First Amendment[]" rights, the FEC "has no interest in the enforcement of an unconstitutional law." (Mot. at 33).  Again, PAG attempts here to bootstrap its balance of equities argument to its First Amendment arguments, which the court has already found unlikely to succeed.

The court finds that the "presumption of constitutionality which attaches to every Act of Congress" is "an equity to be considered in favor of [the government] in balancing hardships," *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984), and that whenever the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

In light of these findings, the court holds that PAG has not established the balance of equities prong of the preliminary injunction analysis.

### iii. The Public Interest

As to the public interest prong, PAG again relies on a presumption that the Name Identification Requirement violates its First Amendment rights, arguing that securing First Amendment rights and stopping the unconstitutional application of a statute are in the public interest.  (Mot. at 24).  PAG also claims that "[t]here can be no public interest in prohibiting certain speakers from referencing candidates for public office in website URLs or on social media platforms in a manner that expresses support for those candidates, and where no solicitation of funds is involved."  (*Id.*).

The FEC argues that it is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statutes it administers, and that enjoining it from performing its statutory duty would constitute a substantial public injury.  (Opp. at 42-43) (citing *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000); *Christian Civic League of Me., Inc. v. FEC*, 433 F. Supp. 2d 81, 90 (D.D.C. 2006) (per curiam)).  The FEC also argues that upsetting its regulatory framework with the upcoming Presidential election just over the horizon, and after the Name Identification Requirement "has been law for twenty-one years," would "'be imprudent, to say the least, and certainly not in the public interest.'"  (*Id.*) (quoting *Rufer v. Fed. Election Comm'n*, 64 F. Supp. 3d 195, 206 (D.D.C. 2014)).

Having determined that PAG is not likely to succeed on the merits of its First Amendment claims and having credited the aforementioned FEC arguments, the court holds that PAG has failed to satisfy the public interest prong of the preliminary injunction analysis.

IV.     **CONCLUSION**

For the foregoing reasons, PAG's Motion for Preliminary Injunction is denied.

An appropriate Order accompanies this Memorandum Opinion.


Date:  September 24, 2015


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge