UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PURSUING AMERICA'S GREATNESS, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 15-cv-1217 (TSC) |
| FEDERAL ELECTION COMMISSION, | ) |
| Defendant. | ) |

# MEMORANDUM OPINION

On October 12, 2016, this court issued a preliminary injunction enjoining Defendant Federal Election Commission ("FEC") from enforcing 11 C.F.R. § 102.14(a) against Plaintiff Pursuing America's Greatness ("PAG") "in connection with its ownership and operation of certain websites, none of which will solicit contributions or otherwise conduct fundraising activities." ECF No. 31. Section 102.14(a) prohibits unauthorized political committees from using the names of federal candidates in any name under which the political committee conducts activities, including the titles of websites and social media pages. PAG now requests that this court hold that section 102.14(a) violates the First Amendment of the U.S. Constitution because the regulation is not narrowly tailored to promote a compelling governmental interest. The FEC seeks a finding that the regulation is lawful and a dissolution of the preliminary injunction currently in place.

The court has considered the parties' pleadings, including PAG's Motion for Summary Judgment, ECF No. 38 ("Pl. Mot."); FEC's Cross-Motion for Summary Judgment and Opposition to PAG's Motion for Summary Judgment, ECF Nos. 40 & 41 ("Def. Mot."); PAG's

Opposition to FEC's Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment, ECF Nos. 42 & 43 ("Pl. Rep."); and FEC's Reply in Support of its Motion for Summary Judgment, ECF No. 45 ("Def. Rep."). Because the court finds that the FEC's regulation is not narrowly tailored to promote a compelling governmental interest, and that 11 C.F.R. § 102.14(b)(3) is not severable from the remainder of the regulation, the court hereby **GRANTS** PAG's motion for summary judgment and **DENIES** FEC's cross-motion for summary judgment.

I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quotation marks and citation omitted); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the materials facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (quotation marks and citation omitted).

## II. REGULATORY AND PROCEDURAL BACKGROUND[1]

### A. Regulatory Background

The Federal Election Campaign Act ("FECA") requires that an authorized political committee use the candidate's name in its registered name but forbids an unauthorized committee from using the candidate's name in its registered name. Specifically, 52 U.S.C. § 30102(e)(4) provides: "The name of each authorized committee shall include the name of the candidate who authorized such committee . . . . In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name." In enacting this provision, Congress intended that "the average contributor or voter be able to determine, by reading the committee's name, on whose behalf the committee is operating." H.R. Rep. No. 95-982, at 11–12, 46 (1978).

In its implementing regulations, the FEC originally interpreted the statutory provision as limiting the use of a candidate's name only in the formal name under which the Political Action Committee ("PAC") registers with the FEC, and not the names of its fundraising projects. *Pursuing America's Greatness v. FEC*, 132 F. Supp. 3d 23, 27 (D.D.C. 2016) ("*PAG I*"). The D.C. Circuit upheld that construction as a reasonable interpretation of the statute in *Common Cause v. FEC*, 842 F.2d 436, 440–41 (D.C. Cir. 1988).[2]

---

[1] Most of the relevant background is contained in *Pursuing America's Greatness v. FEC*, 132 F. Supp. 3d 23, 26–31 (D.D.C. 2015) ("*PAG I*") and *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 503–04 (D.C. Cir. 2016) ("*PAG II*") and will not be repeated here.

[2] The Court of Appeals in *Common Cause* found that "'[t]he bare text' of § 30102(e)(4) 'could conceivably accommodate either the construction adopted by the FEC'—*i.e.,* that the statute applied 'only to the official or formal name under which a political committee must register'—'or that proposed by Common Cause'—*i.e.,* that the statute did not refer only to 'the officially registered "name" of a political committee but rather *any* title under which such a committee holds itself out to the public for solicitation or propagandizing purposes.'" *PAG I*, 132 F. Supp. 3d at 27–28 (quoting *Common Cause*, 842 F.2d at 440–41).

Subsequently, in 1992, based on concerns about "the potential for confusion or abuse in . . . situation[s] where an unauthorized committee uses a candidate's name in the title of a special fundraising project," the FEC promulgated a Notice of Proposed Rulemaking ("NPRM") regarding amendments to § 102.14. Special Fundraising Projects by Political Committees, 57 Fed. Reg. 13,056, 13,057 (proposed Apr. 15, 1992). After it considered the comments submitted in response to the NPRM, the FEC decided "to adopt in its final rule a ban on the use of candidate names in the titles of all communications by unauthorized committees." Special Fundraising Projects and Other Use of Candidate Names by Unauthorized Committees, 57 Fed. Reg. 31,424, 31,425 (July 15, 1992) ("1992 Explanation & Justification"). As revised, 11 C.F.R. § 102.14(a), known as the PAC Name Prohibition, prohibits unauthorized political committees, like PAG, from using: "the name of any candidate in its name. For purposes of this paragraph, 'name' includes any name under which a committee conducts activities, such as solicitations or other communications, including a special project name or other designation."

Two years later, the FEC promulgated an exception to the PAC Name Prohibition. *See* Special Fundraising Projects and Other Use of Candidate Names by Unauthorized Committees, 59 Fed. Reg. 17,267 (April 12, 1994) ("1994 Explanation & Justification"). The exception, § 102.14(b)(3), allows an unauthorized committee to use a candidate's name in its special project name if "the title clearly and unambiguously shows opposition to the named candidate." In enacting this exception, the FEC explained "that the potential for fraud and abuse is significantly reduced in the case of such titles [that clearly indicate opposition]." *Id.* at 17,269.

B.  Procedural Background

This court initially denied PAG's request for a preliminary injunction, concluding that § 102.14(a) was neither a prior restraint on speech nor a content-based speech regulation, but

instead was a permissible component of "FECA's disclosure regime," imposing a limited burden on speech. *PAG I*, 132 F. Supp. 3d at 37–39. This court also rejected PAG's argument that the regulation violated the Administrative Procedure Act ("APA"). *Id.* at 36.

The D.C. Circuit reversed and remanded, finding that the regulation was a content-based speech ban. *PAG II*, 831 F.3d at 512. It explained:

> On its face, section 102.14 draws distinctions based solely on what PAG says. As an unauthorized committee, PAG can use a candidate's name in a title of a communication only if the title demonstrates opposition to the candidate. In other words, to know whether to apply section 102.14, the FEC must examine the content of the title of PAG's website or Facebook page and ask whether the title supports or opposes the candidate. That is content-based discrimination pure and simple.

*Id.* at 509. (quotation marks and citations omitted). The Court further found that "[b]ecause section 102.14(a) restricts political speech based on its content, the FEC may enforce the regulation only if it passes strict scrutiny." *Id.* at 510.

In analyzing the first strict scrutiny requirement—that the law advances a compelling governmental interest—the Court of Appeals stated:

> We assume that the government has a compelling interest in avoiding the type of voter confusion identified by the FEC. Here, the FEC reasonably fears that voters might mistakenly believe an unauthorized committee's activities are actually approved by a candidate if the committee uses the candidate's name in its title.

*Id.* (citation omitted). However, the Court found that the regulation likely failed the second strict scrutiny requirement—that the law is narrowly tailored—because there was "a substantial likelihood that section 102.14 [was] not the least restrictive means to achieve the government's interest." *Id.* Narrow tailoring requires that "[i]f a less restrictive alternative for achieving that interest exists, the government must use that alternative." *Id.* (quotation marks and citation omitted). As the Court of Appeals noted, "the FEC could require a large disclaimer at the top of the websites and social media pages of unauthorized committees that declares, 'This Website Is

Not Candidate Doe's Official Website.'  The Supreme Court regularly views such disclosure requirements as less restrictive alternatives to 'flat bans' on speech." *Id.* (citations omitted).  The Court of Appeals found "no evidence that larger or differently worded disclosures would be less effective at curing fraud or abuse than a ban on speech" and that "the FEC [did not] make an effort to explain why such disclosures would be more burdensome." *Id.* at 511.  Explaining that "[w]here the 'record is silent as to the comparative effectiveness of . . . two alternatives'—one of which burdens more speech than the other—the more burdensome restriction cannot survive strict scrutiny," *id.* (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 826 (2000)), the Court of Appeals concluded that "there is a substantial likelihood that section 102.14 fails strict scrutiny and violates the First Amendment as applied to PAG." *Id.*

The Court of Appeals also found that because "the FEC reasonably applied the naming requirements of section 102.14 to an unauthorized committee's websites and social media pages," PAG was "unlikely to succeed on its APA challenge." *Id.* at 506.

Accordingly, the Court of Appeals reversed this court's denial of the motion for a preliminary injunction and remanded "for the district court to enter a preliminary injunction enjoining the application of 11 C.F.R. § 102.14(a) against PAG's websites and social media pages." *Id.* at 512.

In its motion for summary judgment, PAG has not pursued either its prior restraint or APA claims.  PAG's motion for summary judgment argues only that section 102.14 is an unconstitutional content-based speech ban.  Accordingly, PAG's APA and prior restraint claims are waived.  *See Evans v. Sebelius*, 716 F.3d 617, 619 (D.C. Cir. 2013).  Therefore, the sole question before the court on summary judgment is whether the FEC has carried its burden of

proving that section 102.14(a) is narrowly tailored to promote a compelling governmental interest.³

### III. ANALYSIS

#### A. Strict Scrutiny

A content-based law is constitutional only if it survives strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015). Strict scrutiny requires that the law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (quotation marks and citations omitted). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted). "[I]t is the rare case in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1665–66 (2015) (quotation marks and citations omitted). "If a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative." *Playboy Entm't Grp., Inc.*, 529 U.S. at 813. "When the government restricts speech, the government bears the burden of proving the constitutionality of its actions," *id.* at 816, by showing both that the law furthers a compelling governmental interest and that the law is narrowly tailored. "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the [g]overnment's obligation to prove that the alternative will be ineffective to achieve its goals." *Id.* The government "'must present more than anecdote and supposition' to support [its]

---

³ The FEC has preserved "its argument that the regulation is a disclosure provision that is reviewed for exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest until such time as the Court of Appeals has an opportunity to consider the question on full merits review." Def. Mot. at 15–16 (internal quotation marks and citations omitted).

regulation subject to strict scrutiny." *PAG II*, 831 F.3d at 511 (quoting *Playboy Entm't Grp., Inc.,* 529 U.S. at 822).

### B. The FEC Has Demonstrated A Compelling Interest

In promulgating section 102.14, the FEC determined that it had "substantial evidence" that the use of a candidate's name in the fundraising project of an unauthorized committee often leads potential contributors to "wrongly believe that their contribution will be used in support of the candidate(s) named in the project titles." 1994 Explanation & Justification, 59 Fed. Reg. at 17,268. The rulemaking record amply supports this conclusion, and the case law warrants a finding that avoiding this potential for voter confusion is a compelling governmental interest.

Numerous examples in the record support the FEC's decision to revise § 102.14, after *Common Cause*, in response to its "increasing[] concern[s] over the possibility for confusion or abuse." *Id.* For example, the title "American's [sic] for Reagan" misled a United States Senator into believing that the group was associated with Ronald Reagan's presidential campaign, even though the unauthorized committee "Americans for Change" was unaffiliated with the campaign. ECF No. 40, Defendant's Statement of Material Facts ("Def. SMF") ¶¶ 43–44. In another example, in 1988 President George H.W. Bush's campaign committee reported that an unauthorized committee had created a program named "Americans for Bush" which raised over $10 million, despite the efforts of the candidate's authorized committee to prevent the unauthorized committee from using the name "Americans for Bush." The authorized committee expressed its "concern [] that these projects have the potential to mislead contributors into believing that the money raised will go directly to the candidate for whom they are named." *Id.* ¶ 47. Similarly, President Bush's authorized committee demanded that another unauthorized group, Presidential Victory Committee, which was operating a project called "Citizens for Bush"

and had raised over a quarter million dollars using that name, cease all activities under that name or any other name that would confuse people into believing that its activities were associated with the official campaign. *Id.* ¶ 48. A similar tactic was used in 1988 when Representative Jack P. Kemp was a presidential candidate. *Id.* ¶ 45. An unauthorized committee, the Conservative Victory Committee, raised hundreds of thousands of dollars through a project called "Americans for Kemp." *Id.* None of the money raised actually supported Mr. Kemp's candidacy. *Id.*

The rulemaking record also included a 1992 NBC Dateline report, which stated "that thousands of Americans, most of them elderly, ha[d] been fooled" by a man who raised more than $9 million through committees using candidates' names. *Id.* ¶ 49. For instance, Dateline investigators found that an elderly woman "sent the Reagan Political Victory Fund almost $25,000 after receiving [a]ppeals for money to help keep the legacy of Ronald Reagan alive . . . ." *Id.* (internal quotation marks omitted) (alteration in original). The Reagan Political Victory Fund was not authorized to use Reagan's name. *Id.* Similarly, "95-year-old Dana Chatlin of Iowa . . . reportedly sent the Reagan Political Victory Fund all the money she had put aside for a nursing home," *id.* ¶ 125 (internal quotation marks omitted), and Dagmar Cantola sent the Reagan Political Victory Fund more than $3,000 after receiving letters from the person who ran the fund stating that he would be forced to resign unless he got more money, *id.* ¶ 126. The Dateline report "found that only about one percent of the $9 million dollars that the committees raised went directly to any candidate." *Id.* ¶ 127.

Therefore, the FEC justifiably believed that the evidence showed "the potential for confusion or abuse when an unauthorized committee uses a candidate's name in the title of a special fundraising project, or other designation under which the committee operates." 1994

Explanation & Justification, 59 Fed. Reg. at 17,268 (discussing these examples). *See also PAG II*, 831 F.3d at 510 ("Here, the FEC reasonably fears that voters might mistakenly believe an unauthorized committee's activities are actually approved by a candidate if the committee uses the candidate's name in its title.").

PAG essentially concedes that the record demonstrates that people are confused when unauthorized committees use candidates' names in special projects. It mainly argues that the justification for the PAC Name Prohibition does not extend "beyond the fundraising context." Pl. Mot at 26. *See also* Pl. Rep. at 6–7 (asserting that "the FEC has not proven the existence of a problem in need of a content-based speech ban, namely, confusion among the electorate related to the use of candidate names in 'special projects' that do not fundraise or solicit contributions").

This argument has two weaknesses. First, PAG never explains, as a logical matter, why an unauthorized committee's ultimate goal—whether to solicit funds or to prime people to support a candidate—affects the likelihood that a reader will be confused. If someone is misled by a project's name because it includes the candidate's name, confusion will result whether or not funds are being solicited. Thus, PAG identifies a distinction between fundraising and non-fundraising projects without demonstrating a functional difference between the two categories.

Second, the evidence shows that the type of confusion that could occur in the fundraising context from the use of a candidate's name also arises in the purely informational context. As noted previously, the record is replete with numerous comments on the "I like Mike Huckabee" Facebook page directed towards Governor Huckabee. *PAG I*, 132 F. Supp. 3d at 35.[4] Examples of the posts include: "Amen! You would really change some things, in Washington. God bless

---

[4] While many of these comments were posted before PAG took over the Facebook page, a significant number were posted after PAG took control. *PAG I*, 132 F. Supp. 3d at 35.

you."; "We just need a leader and you are the leader we need!!!!"; "You have my vote for President"; "You are a good man Mike, you have my vote!!!!!"; "Mike we would have been better off years ago with you in the White House." Def. SMF ¶ 95. These examples demonstrate that viewers of the "I like Mike Huckabee" Facebook page confused it with an authorized Huckabee committee on a purely informational basis. Although PAG argues it is unclear "whether persons who posted these comments were actually confused by PAG's Facebook page," Pls. Mot. at 28, the comments themselves show an attempt to communicate with Mr. Huckabee.

Section 102.14 reflects the FEC's well-grounded concern that people will be misled by unauthorized committees using a candidate's name, and advances the government's "compelling interest in protecting voters from confusion and undue influence." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion). In *Burson*, the Supreme Court, applying strict scrutiny, upheld a Tennessee statute prohibiting solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place. The Court explained:

> Tennessee argues that its restriction protects the right to vote in an election conducted with integrity and reliability. The interests advanced by Tennessee obviously are compelling ones. This Court has recognized that the right to vote freely for the candidate of one's choice is of the essence of a democratic society. Indeed, no right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Accordingly, this Court has concluded that a State has a compelling interest in protecting voters from confusion and undue influence. See *Eu* [*v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 228–229 (1989)]. The Court also has recognized that a State 'indisputably has a compelling interest in preserving the integrity of its election process.' *Id.*, at 231. The Court thus has 'upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.'" *Anderson v. Celebrezze*, 460 U.S. 780, 788, n.9 (1983) (collecting cases).

*Id.* (plurality opinion) (various internal quotations, citations and brackets omitted) (footnotes omitted). The Court noted that the government has an "important and legitimate interest in voter

education." *Anderson*, 460 U.S. at 796 (1983). In furtherance of these goals, the Supreme Court has emphasized that the government also has an interest in "provid[ing] the electorate with information about the sources of election-related spending." *McCutcheon v. FEC*, 572 U.S. 185, 223 (2014) (internal quotation marks omitted) (alteration in original). Therefore, "[i]dentification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 792 n.32 (1978).

Section 102.14(a) advances the goal of preventing confusion about whether a candidate supports a message communicated by an unauthorized committee and whether a monetary contribution in response to an appeal by an unauthorized committee will be directed to the candidate's official campaign. These interests fit squarely within the Supreme Court's firmly established tradition of finding a compelling governmental interest in protecting the "integrity and reliability of the electoral process" by eliminating voter confusion, including through a requirement that the electorate be informed accurately about the source of a political message.

Although PAG argues that *Burson*'s concern with avoiding voter confusion is limited to the polling place, *see* Pl. Rep. at 7–8, the interests identified by the Supreme Court indicate a broader appreciation of the compelling interest in protecting the electorate from confusion. *See, e.g., Eu*, 489 U.S. at 228 (noting that "the State has a legitimate interest in fostering an informed electorate" by protecting "voters from confusion and undue influence"); *Anderson*, 460 U.S. at 796 ("There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election."). The government's interest in preventing confusion in the voting process surely extends to combating subtle yet effective

forms of confusion about a candidate's position and who will benefit from a monetary contribution.

In arguing that § 102.14(a) does not advance a compelling interest, PAG misreads *United States v. Alvarez*, 567 U.S. 709 (2012). *See* Pl. Rep. at 8. The Supreme Court in *Alvarez* held that the speech restrictions imposed by the Stolen Valor Act (which made it a crime to fraudulently claim to be a recipient of certain military decorations or awards) were not actually necessary to achieve the government's interest in promoting respect and gratitude for military service. *Alvarez*, 567 U.S. at 725 ("The link between the Government's interest in protecting the integrity of the military honors system and the Act's restriction on the false claims of liars like respondent has not been shown.") (plurality opinion); *id.* at 739 ("The Government has provided no convincing explanation as to why a more finely tailored statute would not work.") (Breyer, J., concurring in judgment). This holding does not call into question the Supreme Court's repeated acknowledgement that preventing electorate confusion is a compelling governmental interest. Similarly, PAG's reliance on *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995), is unavailing. In *McIntyre* the Supreme Court struck down a state disclosure statute because of its "extremely broad prohibition." *Id.* at 351. The almost limitless statute in *McIntyre* is not comparable to a regulation designed to prevent a demonstrated type of voter confusion.

### C. The Regulation Is Not Narrowly Tailored

In *PAG II* the D.C. Circuit held that because the FEC had "not shown that its speech ban is the least restrictive means of achieving the government's interest, there is a substantial likelihood that section 102.14 fails strict scrutiny and violates the First Amendment as applied to PAG." *PAG II*, 831 F.3d at 511. The Circuit found that "[t]he FEC offered no evidence that larger or differently worded disclosures would be less effective at curing fraud or abuse than a

ban on speech." *Id.* at 510–11. Therefore, the decisive question is whether the FEC has sufficiently expanded the record, beyond what it presented to the Court of Appeals, with evidence demonstrating that such disclosures would be a less effective or more burdensome alternative to § 102.14.

PAG has proposed two examples of additional or different disclosure requirements. First, PAG suggests "an additional disclaimer at the top of a website (in addition to the 'paid for by' and 'not authorized by any candidate or candidate's committee' disclaimers required at the bottom of the website) declaring: 'This Website Is Not Candidate Doe's Official Website.'" Pl. Mot. at 31 (citations omitted). Alternatively, PAG points to amici's proposal during litigation before the Court of Appeals that "the FEC could require that an unauthorized committee's use of a candidate's name must clearly indicate it is a third party." *Id*. (citations omitted).

In claiming that it has successfully expanded the record, the FEC points out that during the rulemaking: 1) a national committee observed that a disclaimer would have to be large to be effective; 2) one Commissioner expressed concern that some disclaimers could be effectively buried; and 3) Commission staff warned that requiring a larger disclosure might upset the regulated community by telling them "how to draft [their] letters." Def. Mot. at 32. These observations are anecdotal, not based on empirical evidence, and simply speculate about potential problems rather than analyze whether the proposed procedures would be feasible and/or effective. Moreover, a concern that some political parties or candidates might object to disclosures does not constitute evidence that those disclosures would be ineffective.

The FEC also notes that the Commission agreed with its staff that larger disclaimers "'could be more burdensome . . . while still not solving the potential for fraud and abuse in this area.'" *Id.* (quoting 1994 Explanation & Justification, 59 Fed. Reg. at 17,268). However, the

FEC has not shown that these conclusions were based on any actual evidence or study of larger and different disclosures. In addition to the rulemaking evidence, the FEC identifies several instances in which some disclaimers failed to prevent viewer confusion. *See id.* at 34. But even if true, such isolated, anecdotal evidence is insufficient for the FEC to carry its burden. "[T]he FEC must present more than anecdote and supposition to support a regulation subject to strict scrutiny." *PAG II*, 831 F.3d at 511 (quotation marks and citations omitted).

The FEC cannot offset its failure to present evidence that its regulation is the least restrictive means of achieving the government's interest by relying on "common sense" to demonstrate that different or additional disclosures would not effectively prevent confusion. *See* Def. Mot. at 30 (arguing that "the Commission may rely on 'common sense' and need not 'empirically' prove that the regulation advances its compelling interest"). The role of common sense in this context is more limited than the FEC supposes. As the D.C. Circuit has explained, common sense is useful in showing the validity of "unprovable assumptions":

> Furthermore, while [i]t is true that in some First Amendment cases the Supreme Court has demanded an evidentiary showing in support of a state's law, [i]t is also true that in other First Amendment cases the Supreme Court has found various unprovable assumptions sufficient to support the constitutionality of state and federal laws.

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 15–16 (D.C. Cir. 2009) (quotation marks omitted) (citations omitted) (alterations in original). For instance, in *Burson*, on which the FEC relies, the Supreme Court used "simple common sense" to find that "some restricted zone around polling places is necessary to protect" ballot secrecy. *Burson*, 504 U.S. at 211 (plurality opinion). *See id.* at 208 (holding "that *some* restricted zone around the voting area is necessary to secure the State's compelling interest") (plurality opinion) (emphasis in original). Unlike in *Burson*— where the need for *some* restricted zone around the ballot box is obvious—the crucial determination in this case—whether different disclosures would eliminate confusion as

effectively as the name prohibition—is not "unprovable," but susceptible to empirical analysis. Accordingly, the FEC has failed to carry its burden to demonstrate that the regulation is narrowly tailored.

### D. 11 C.F.R. § 102.14(b)(3) Is Not Severable

The FEC argues that even if this court finds § 102.14 constitutionally infirm, the appropriate remedy would be to strike § 102.14(b)(3) and uphold the remainder of the regulation because without subsection (b)(3) the regulation is no longer a content-based restriction on speech. "Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (citation omitted) (emphasis in original). When evaluating the intent of the agency, the court must be able to find "*without any substantial doubt* that the agency would have adopted the severed portion on its own." *ACA Int'l v. FCC*, 885 F.3d 687, 708 (D.C. Cir. 2018) (quotation marks and citation omitted) (emphasis added).

Although the FEC originally promulgated the regulation without the exception to the general name prohibition, it subsequently concluded that its regulation, without the exception, reached too far, and revised the regulation to add subsection (b)(3) after finding that "[t]here is no danger of confusion or abuse inherent in the use of a candidate's name by a committee or project which opposes the candidate." 59 Fed. Reg. at 17,269 (quotation marks omitted). Accordingly, the court cannot find "without any substantial doubt," *ACA Int'l*, 885 F.3d at 708, that the FEC would have adopted the remaining portion of the regulation on its own.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is hereby **GRANTED** and Defendant's Motion for Summary Judgment is hereby **DENIED**. The court hereby declares that 11 C.F.R. § 102.14(a) violates the First Amendment of the U.S. Constitution. The court further permanently enjoins the FEC from enforcing 11 C.F.R. § 102.14(a).

A corresponding order will issue separately.

Date: March 21, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge